# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6786 | **DATE** | 2/14/2001 |
| **CASE TITLE** | American Natl Bnk & Trust vs. AXA Client Solutions | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 2/28/2001 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Defendants' motion (Doc 7-1) to dismiss is granted in part and denied in part, as follows: (1) the motion is denied with respect to Plaintiff Emerald Investments LP's claim for breach of contract against Defendant Equitable Life Assurance Society of the United States under the Special Transfer Agreement as applied to the first and second annuity accounts; (2) all remaining breach of contract claims are dismissed without prejudice; (3) claims for attorneys' fees are dismissed without prejudice; (4) the motion is denied with respect to Plaintiffs' claim for injunctive relief.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | FEB 1 4 2001 | |
| | Notified counsel by telephone. | | date docketed | 18 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Trustee f/b/o EMERALD INVESTMENTS LP, and EMERALD INVESTMENTS LP, an Illinois partnership, <br><br> Plaintiffs, <br><br> vs. <br><br> AXA CLIENT SOLUTIONS, LLC; THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES; and AXA FINANCIAL, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 00 C 6786 <br><br> DOCKETED <br> FEB 1 4 2001 |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on Defendants' motion to dismiss the complaint with prejudice. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

For the purposes of Defendants' motion to dismiss, we accept the following allegations set forth in the complaint as true:

18

Plaintiff Emerald Investments, LP ("Emerald"), is a limited partnership that invests in stocks, bonds, mutual funds and other investment vehicles. Sometime in late 1998 or early 1999, Emerald began to explore the possibility of investing in "EQUI-VEST" annuities marketed by Defendant Equitable Life Assurance Society of the United States ("Equitable"). Emerald's Rob Rubin met with Equitable sales agent Ferdinand Ruplin to discuss Emerald's need for a high degree of trading flexibility so Emerald could transfer assets among its various investment options at will. Ruplin told Rubin that the EQUI-VEST annuities provided a satisfactory investment vehicle to meet this need in that the product allowed unlimited transfers into and out of various investments. In this vein, Ruplin referred Rubin to the May 1, 1998 EQUI-VEST Prospectus, which indicated that "no transfer restrictions apply" for investors choosing the Maximum Transfer Flexibility investment option. The Prospectus also indicated, however, that "[u]pon 90 days advance notice, [Equitable] ha[s] the right to change or establish additional restrictions on transfers among the Investment Options."

Before investing in any Equitable annuities, Emerald sought certain and specific assurances from Equitable to the effect that Emerald's right to unlimited transfers would not be restricted in the future. On behalf of Emerald, Ruplin obtained from Equitable Manager Louis Marino a March 22, 1999, letter

confirming those provisions of the Prospectus that stated that "[t]here are no transfer restrictions associated with the 'Maximum Transfer Flexibility.'" Ruplin then explained Emerald's concerns to Mark Hug, Senior Vice President for Equitable. On April 15, 1999, Hug wrote to Ruplin and indicated that he would "guarantee a special arrangement" to address Emerald's concerns regarding unlimited transfers. He reiterated that currently "we have no restriction on the timing of the transfers," and stated that "[w]e are willing to ensure that if the *Maximum Transfer Flexibility Option* is limited some time in the future, your client only, will be guaranteed at least twenty-six transfers per contract year." Hug spoke with Ruplin again on April 28, 1999. In a letter memorializing their conversation, Hug wrote:

> As a supplement to my letter dated April 15, 1999, I want to confirm the special transfer agreement we granted for the first Emerald Trust Equi-Vest annuity, and extend it to any additional Equi-Vest annuities purchased by the Emerald Trust. For all Equi-Vest annuities of the Emerald Trust, we guarantee that if we impose a transfer limit, we will still allow 26 transfers from the date of the announced limit through the end of the calendar year.

According to the complaint, Equitable further promised Emerald that it would permit Emerald to fund five separate annuity accounts, totaling $60 million in initial funding, under the above mentioned "Special Transfer Agreement."

Through its trustee, Plaintiff American National Bank and Trust Company of Chicago ("American National Bank"), Emerald opened two EQUI-VEST annuity accounts: one on April 28, 1999, and one on May 9, 1999. It opened a third annuity account with Equitable on September 29, 1999, this time choosing a product called the Equitable ACCUMULATOR. Emerald alleges that Hug and Ruplin assured it that the Special Transfer Agreement would apply to all additional annuity accounts it opened with Equitable and that it relied on these assurances in funding the EQUI-VEST and ACCUMULATOR accounts.

On or about July 20, 2000, Equitable's parent company, Defendant AXA Financial, Inc. ("AXA Financial"), through its subsidiary AXA Client Solutions, LLC ("AXA Client Solutions"), informed Emerald for the first time that its trading practices violated company policies against "market timing." On July 27, AXA Client Solutions Executive Vice President Brian O'Neil wrote to Emerald's Rob Rubin to notify Emerald "to stop market timing, specifically to stop making transfers between funds for less than a week, as of Monday, July 31, 2000." O'Neil stated that AXA Client Solutions was unable to compromise on this point because of the impact Emerald's trading practices were having on AXA's other clients. O'Neil also informed Rubin that "we will no longer make [instant] transfer request services available." Emerald would thereafter be required to

- 4 -

submit transaction requests by mail only. Although the letter left open the possibility that the companies could agree on some other solution to bring Emerald into compliance with AXA's purported market timing policy, it does not appear that any further negotiations ensued.

Instead, according to a September 13, 2000, letter from O'Neil to Rubin, Emerald transferred roughly $55.5 million dollars into and back out of several of its Equitable funds between September 7th and 11th. In O'Neil's opinion these transfers violated the market timing policy because "the transfer out of the international equity funds occurred in less than 5 business days from the transfer into these funds." AXA Client Solutions therefore implemented the threatened policy of permitting Emerald to submit transfer requests by mail only.

On October 13, 2000, Emerald wrote to AXA Client Solutions and demanded that it either abide by the Special Transfer Agreement or refund Emerald's investments in the annuities. On October 16, 2000, Axa responded that it was maintaining its mail-only policy and would "process [Emerald's] request for funds." The next day, Brian O'Neil left a voice mail message for Rob Rubin indicating that Defendants would charge a contractual surrender fee of $2.16 million in connection with the cancellation of the annuities.

Emerald contends that Defendants' refusal to permit it to transfer money freely among its accounts within a short period of time has prevented Emerald from executing trades "with the speed and flexibility it had bargained for." Thus on October 30, 2000, Emerald and American National Bank (as trustee for Emerald) filed a three-count complaint against Equitable, AXA Client Solutions, and AXA Financial, alleging breach of the Special Transfer Agreement and conversion. As relief, Plaintiffs seek compensatory and punitive damages, attorneys' fees, and an injunction preventing Defendants from restricting Emerald's trading activity under the "1999 Trading Agreement." Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the entire complaint, with prejudice.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. <u>Bontkowski v. First National Bank of Cicero</u>, 998 F.2d 459, 461 (7th Cir. 1993). Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. <u>Id.</u> In ruling on a motion to dismiss, we must accept all well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff. <u>Turner/Ozanne v. Hyman/Power</u>, 111 F.3d 1312, 1319 (7th Cir. 1999). The allegations of a complaint should not be dismissed

for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Hartford Fire Insurance Co. v. California, 509 U.S. 764 (1993); Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir. 1994). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992).

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed. R. Civ. P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993). It is with these principles in mind that we turn to the motion before us.

## DISCUSSION

### I. Breach of Contract

Defendants move to dismiss the claim for breach of contract, arguing that Plaintiffs have failed to allege the essential elements of the claim. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992). To state a claim for breach of contract, plaintiffs must allege that (1) a contract existed; (2) plaintiffs performed their contractual obligations; (3) defendants breached the contract; and (4) plaintiffs suffered damages because of that breach. Industrial Hard Chrome, Ltd. v. Hetran, Inc. et al., 64 F. Supp. 2d 741, 745 (N.D. Ill. 1999) (citing Janivo Holding, B.V. v. Continental Bank, N.A., No. 91 C 7728, 1992 WL 345391, at *3 (N.D. Ill. Nov.16, 1992)). In Count I of the complaint, Plaintiffs allege generally that "[the Special Transfer Agreement between Equitable and Emerald was a legally binding contract, supported by consideration." They further allege that, "[by their actions and statements, defendants have breached their Special Transfer Agreement with Emerald." The question on Defendants' motion to dismiss is whether the essential facts supporting Plaintiffs' conclusory allegations can be found, either directly or by inference, elsewhere in the complaint.

## A. The contract

The threshold inquiry is whether Plaintiffs have adequately pled the existence of a legally binding contract. According to the specific allegations in Count I, the "contract" that Defendants breached is the "Special Transfer Agreement between Equitable and Emerald." The "Special Transfer Agreement" is defined only vaguely in paragraph 20 of the complaint as an agreement confirmed in the April 29, 1999 letter from Equitable Senior Vice President Mark Hug to Equitable sales representative Ferdinand Ruplin and "described above." Hug's April 29 letter reads, in pertinent part,

> As a supplement to my letter dated April 15, 1999, I want to confirm the special transfer agreement we granted for the first Emerald Trust Equi-Vest annuity, and extend it to any additional Equi-Vest annuities purchased by the Emerald Trust. For all Equivest annuities of the Emerald Trust, we guarantee that if we impose a transfer limit, we will still allow 26 transfers from the date of the announced limit through the end of the calendar year. As mentioned previously, we have no plans to change our policy of unlimited transfers (under the Maximum Transfer Flexibility Option) in the future.

The letter, and paragraphs 17 through 19 of the complaint, refer to an April 15 letter from Hug to Ruplin, which Hug wrote "in response to your client's [Emerald's] request to have the Equitable guarantee an unlimited amount of transfers within their contract." In that letter, Hug described the Maximum Transfer Flexibility Option as follows:

> We currently offer unlimited transfers within the Equi-Vest product...by choosing the *Maximum Transfer Flexibility Option*. We have no plans to change this policy in the future. We believe that it is important to offer investors as much flexibility as possible. In fact, the Equi-Vest product is a leader in this feature, as the industry standard for maximum transfers between sub-accounts is currently twelve. Moreover, we have no restrictions on the timing of the transfers. A client, for example, can request ten transfers a week in [sic] he so desires.

He then went on to describe "a special arrangement" that Equitable would guarantee "if unlimited transfers are of particular importance to [Emerald]":

> We are willing to ensure that if the *Maximum Transfer Flexibility Option* is limited some time in the future, your client only, will be guaranteed at least twenty-six transfers per contract year. We believe this amount alone, or in combination with the free corridor and asset rebalancing feature, will meet your client's needs.

It is clear from the complaint and from the text of Hug's two letters – which are attached as exhibits to the complaint – that the "Special Transfer Agreement" alleged in paragraph 20 is Equitable's guarantee of twenty-six transfers per year in exchange for Emerald's funding of an Equitable annuity account (or its promise to do so). It is this exchange that Hug refers to as a "special arrangement" and, later, a "special transfer agreement." It is also the sole "contract" referred to in Count I of Plaintiffs' complaint.

Plaintiffs appear to argue, in their brief in opposition to the motion to dismiss, that the Complaint alleges a breach of an agreement comprising not only the guarantee set forth in Hug's April 15 and April 29 letters, but also descriptive

language contained in Louis Marino's March 22, 1999 letter, the annuity contracts, the prospectuses, and certain unspecified oral representations. While Plaintiffs are correct in asserting that the law permits multiple instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction to be read and interpreted together as a single contract, see Wilson v. Wilson, 217 Ill. App. 3d 844, 853, 577 N.E.2d 1323 (1st Dist. 1991) and Mayo v. Royal Ins. Co. of America, 662 N.Y.S.2d 654 (N.Y. App. Div. 1997), the complaint as it currently stands does not allege such a wide-ranging agreement. Plaintiffs explicitly seek damages only for breach of the narrowly-defined Special Transfer Agreement. Under the existing complaint, therefore, the annuity contracts, prospectuses, and extraneous communications between the parties constitute, at best, potential evidence of the parties' intent and the meaning of the terms of the Special Transfer Agreement which Defendants are alleged to have breached.

That said, the complaint does succeed in alleging that the Special Transfer Agreement is a legally binding contract. We can reasonably infer from the complaint that Hug's letters of April 15 and April 29, 1999, memorialized offers that Hug expected Ruplin to communicate to Emerald, that the offers were, in fact, communicated to Emerald, and that Emerald accepted them. Emerald further alleges consideration by stating in Count I that "Emerald entered into its annuity contracts

with defendants in express reliance on defendants' guarantee...." Defendants argue that this is merely an explanation of Plaintiffs' future actions and cannot serve as consideration for the Special Transfer Agreement. We disagree. Under Illinois law, "any act or promise which is of benefit to one party or disadvantage to the other is sufficient 'consideration' to support a contract." McInerney v. Charter Golf, Inc., 176 Ill. 2d 482, 486, 680 N.E.2d 1347 (1997) (citing Steinberg v. Chicago Medical School, 69 Ill. 2d 320, 371 N.E.2d 634 (1977)). Because the allegations support the inference that Emerald funded the annuity contracts – which presumably benefitted Equitable – in exchange for Equitable's promise of twenty-six unrestricted transfers, the complaint adequately alleges consideration. It also, consequently, alleges the existence of a contract.

We note one restriction on the applicability of the Special Transfer Agreement, however. Hug's April 15 and April 29 letters contain guarantees with respect to past and future Equi-Vest annuities. Emerald's third annuity was an Accumulator annuity. The Special Transfer Agreement cannot therefore be read to apply to that fund, and the motion to dismiss is granted with respect to the third annuity.

## B. Breach of the Special Transfer Agreement

Defendants next argue that even if the Special Transfer Agreement is a contract, Plaintiffs have failed to allege that it was breached. As a preliminary

matter, we agree with Defendants' assertion that American National Bank, AXA Client Solutions, and AXA Financial were not parties to the Special Transfer Agreement and cannot sue or be sued for a breach thereof. The Special Transfer Agreement is alleged to be a contract between Emerald and Equitable. Because there is no allegation that American National Bank is a party to or third party beneficiary of the contract, it lacks standing to sue for breach. Moreover, neither of the two AXA Defendants is alleged to have been a party to the Special Transfer Agreement. The general allegation that "both AXA Financial and AXA Client Solutions are able to, and, in fact, do exercise significant influence and control over the operations of Equitable" is insufficient to subject those entities to liability under Equitable's contract with Emerald. The claim for breach of contract is therefore dismissed as to American National Bank, AXA Client Solutions, and AXA Financial.

Emerald does, however, state a claim for breach of contract by Equitable. The complaint may be read to allege that the Special Transfer Agreement entitled Emerald to twenty-six *unrestricted* transfers per year per Equi-Vest account, and that Equitable failed to honor this promise by forcing Emerald (through direct correspondence by AXA Client Solutions) to hold its positions for a minimum of five days. Emerald also alleges damages in excess of the jurisdictional amount resulting from "defendants' restriction of Emerald's trading activity in breach the [sic] Special

Transfer Agreement." (Complaint ¶ 41). We therefore deny the motion to dismiss with respect to the claim by Emerald against Equitable for breach of the Special Transfer Agreement.

## II. Conversion

Plaintiffs allege in the complaint that by charging a "surrender" fee of $2.16 million dollars on Emerald's withdrawal of its funds from the three annuity accounts, Equitable wrongfully converted Emerald's investment proceeds. Defendants argue that Plaintiffs have failed to state a conversion claim in that Defendants' action was authorized under § 8.01 of the annuity contracts. Under both Illinois and New York law, the basic elements of a conversion claim are the defendant's unauthorized and wrongful control of property that rightfully belongs to the plaintiff. Filipowski v. Rogovin, 2000 WL 983727, at *2 (N.D. Ill. July 17, 2000) (citing cases). Plaintiffs do not dispute that § 8.01 of the annuity contracts authorizes Equitable to levy a charge on the early withdrawal of an annuity investment. They argue, however, that Equitable may not take advantage of § 8.01 in light of its breach of the Special Transfer Agreement. In support of their position Plaintiffs cite Goldstein v. Lustig, 154 Ill. App. 3d 595, 599, 507 N.E.2d 164, 168 (1st Dist. 1987). Goldstein stands for the basic principle that a party who materially breaches a contract may not take advantage of those terms of the contract that benefit it. As discussed in Part I.A.

above, Plaintiffs have failed to allege that Defendants breached the annuity contracts, or that the Special Transfer Agreement and annuity contracts comprise a single contract. Accordingly, Defendants' alleged breach of the Special Transfer Agreement does not affect their right to levy withdrawal charges under the annuity contracts. Plaintiffs' conversion claim is therefore dismissed for failure to state a claim. Furthermore, because Plaintiffs' claim for attorneys' fees is predicated on their right to recover punitive damages for conversion (see Plaintiff's Response to Defendants' Motion to Dismiss, p. 15), the attorneys' fees claim is also dismissed.

## IV. Injunctive relief

Plaintiffs seek an injunction restraining Defendants from enforcing their "market timing" restrictions against Emerald and ordering Equitable to return the $2.16 million sought under its claim for conversion. Defendants contend that Plaintiffs have failed to state a claim for injunctive relief. In determining whether to grant a claim for injunctive relief, the Court will look, as a threshold matter, to whether plaintiffs can show 1) a likelihood of success on the merits, 2) irreparable harm if the preliminary injunction is denied, and 3) the inadequacy of any remedy at law. Once this threshold showing is made, the court will balance 4) the harm to plaintiffs if the preliminary injunction were wrongfully denied against the harm to the defendant if the injunction were wrongfully granted, and 5) the impact on persons not

directly concerned in the dispute (the "public interest"). Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). The complaint clearly alleges a likelihood of success on the merits and asserts, as a general matter, that there is no adequate remedy at law and that without injunctive relief, Emerald will suffer irreparable harm. Plaintiffs also allege that, if injunctive relief is not granted, the irreparable harm to Emerald and its clients will substantially outweigh any harm to Defendants if such relief is granted.

Defendants contend that the complaint fails to support the general allegations of irreparable harm and the unavailability of an adequate remedy at law. In particular, Defendants claim that the harm identified by Plaintiffs – Emerald's inability to freely pursue its investment strategies and realize profits from those trading activities, as well as its loss of the $2.16 million withdrawal fee – is easily compensable as money damages. Plaintiffs counter that their claims for money damages may prove too speculative or remote. In such a case, Plaintiffs argue, they would seek specific performance of the Special Transfer Agreement.

It is true that, "[a]s a general rule, a defendant's ability to compensate plaintiff in money damages precludes issuance of a preliminary injunction." Signode Corp. v. Weld-Loc Systems, Inc., 700 F.2d 1108 (7th Cir. 1983) (citing cases). We therefore agree with Defendants that injunctive relief would be inappropriate as to the

$2.16 million withdrawal charge. With respect to Plaintiffs' investment losses resulting from the alleged restrictions on their trading activity, on the other hand, Plaintiffs have adequately alleged that damages would be difficult to calculate because they are based on lost profits on Emerald's investments. The Seventh Circuit has recognized that injunctions may be appropriate in such cases. See Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984).

Plaintiffs have also adequately alleged that the balance of harms weighs in their favor and that persons not directly involved in the dispute – Emerald's customers – would be negatively impacted by a failure to grant the injunction. (See Complaint at ¶50.) Plaintiffs have therefore stated a claim for injunctive relief arising out of Defendants' alleged restrictions on Emerald's trading activities.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part, as follows: (1) the motion is denied with respect to Plaintiff Emerald Investments LP's claim for breach of contract against Defendant Equitable Life Assurance Society of the United States under the Special Transfer Agreement as applied to the first and second annuity accounts; (2) all remaining breach of contract claims are dismissed without prejudice; (3) plaintiffs' claim for conversion and all

claims for attorneys' fees are dismissed without prejudice; (4) the motion is denied with respect to Plaintiffs' claim for injunctive relief.

*Charles P. Kocoras*
Charles P. Kocoras
United States District Judge

Dated: February 14, 2001