# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6786 | **DATE** | 6/28/2001 |
| **CASE TITLE** | American Natl Bnk vs. AXA Client Solutions | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/15/2001 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Defendants' motion (Doc 25-1) to dismiss is granted in part and denied in part, as follows: (1) all claims against AXA Client Solutions and AXA Financial are dismissed without prejudice; (2) Count VI is dismissed, with prejudice, in its entirety; and (3) the motion to dismiss is denied with respect to all remaining parties and claims. Defendants are given to July 12, 2001 to answer the complaint. Plaintiffs' motion to compel discovery is granted. Defendants are ordered to comply with outstanding discovery requests by July 12, 2001. Discovery, including depositions, to proceed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUN 2 0 2001 | |
| ✓ | Docketing to mail notices. | date docketed | 42 |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |

ED-7
FILED FOR DOCKETING
01 JUN 28 PM 12: 57

SCT — courtroom deputy's initials

date mailed notice

Date/time received in central Clerk's Office — mailing deputy initials

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUN 2 9 2001

AMERICAN NATIONAL BANK AND TRUST ) 
COMPANY OF CHICAGO, as Trustee f/b/o )
EMERALD INVESTMENTS LP, et al., )
)
            Plaintiffs, )
)
vs. )     00 C 6786
)
AXA CLIENT SOLUTIONS, LLC; et al., )
)
            Defendants. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before the Court on Defendants' motion to dismiss the First Amended Complaint. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

On a Rule 12(b)(6) motion to dismiss, the Court is obligated to accept as true the well-pleaded allegations of the complaint, as follow. Bontkowski v. First National Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993). Plaintiff Emerald Investments, LP ("Emerald"), is a limited partnership that invests in stocks, bonds, mutual funds and other investment vehicles. To carry out its proprietary trading strategy, Emerald requires a high degree of flexibility as it must be able to transfer money rapidly and freely among its various investments. In or about early 1999, Emerald began looking into the suitability of an investment in annuities marketed by Defendant Equitable Life

Assurance Society of the United States ("Equitable"). The owner of an Equitable annuity contract may invest funds in a variety of investment options, including stock, bond and money market mutual funds.

In January 1999, Emerald's Rob Rubin met with Equitable sales agent Ferdinand Ruplin to discuss a possible business relationship. Rubin explained Emerald's need for trading flexibility and stated that Emerald would not invest in any Equitable annuities unless it was first assured that it would be able to rapidly transfer assets at will among the various investment options. Ruplin responded that Equitable's annuities provided a satisfactory investment vehicle to meet Emerald's needs. In particular, he pointed out that certain of Equitable's products offered unlimited transfers into and out of various investments, and opined that this feature would provide precisely the speed and flexibility that Emerald required.

On March 9, 1999, Ruplin sent Rubin an application for an annuity product called the Equi-Vest, along with a letter stating that "if the owner [of an Equi-Vest annuity] elects maximum flexibility, these annuities allow you to fully transfer without restriction between the various investment options of the separate accounts." (First Amended Complaint ("FAC") ¶ 14.) Ruplin also directed Rubin to the May 1, 1998 Equi-Vest Prospectus, which indicated that "no transfer restrictions apply" for investors choosing the "Maximum Transfer Flexibility," as opposed to the "Maximum Fund Choice," investment option. (FAC, Exh. A, at p. 45.) Through the Prospectus, as well as in other promotional materials and conversations, Equitable also indicated that transfers could ordinarily be made twenty-four hours a day electronically or through Equitable's Telephone Operated Program Support ("TOPS") System. (FAC, ¶ 16 and

Exh. A, at p. 10.) The Prospectus contained no mention of any policy restricting an investor from quickly and freely transferring money among the various funds.

Emerald continued to seek assurances from Equitable to the effect that Emerald's right to unlimited transfers would not be restricted in the future. On Emerald's behalf, Ruplin obtained from Equitable Manager Louis Marino a March 22, 1999, letter confirming that, in keeping with the language of the Prospectus, "[t]here are no transfer restrictions associated with the 'Maximum Transfer Flexibility.'" (FAC, Exh. C.) Ruplin further assured Emerald of the validity of the Equi-Vest Prospectus' "no transfer restrictions" guarantee in a March 24, 1999, letter to Gary Hokin of Nikoh Securities Corp. The letter, written to confirm information Ruplin had provided Rob Rubin the day before, states, in pertinent part:

> As per our discussion, this is to confirm that once your client's Equi-Vest certificates are issued, pursuant to the prospectus in effect at the time (May 1, 1998), the contract issued cannot subsequently be changed regardless of new or updated prospectuses issued which would be applicable to new issues. (FAC, Exh. B.)

In addition, Ruplin assured Rubin on more than one occasion, "It's a contract, they can't change it." (FAC ¶ 17.)

Emerald was still concerned and sought more certain and specific assurances that it would be permitted to fully employ its trading strategy even in the face of future modifications to Equitable's transfer policies. Ruplin explained Emerald's concerns to Mark Hug, Senior Vice President for Equitable. On April 15, 1999, Hug wrote to Ruplin and assured him that there would be no transfer restrictions:

> We currently offer unlimited transfers within the Equi-Vest product...by choosing the *Maximum Transfer Flexibility Option*. We have no plans to change this policy in the future. We believe that it is important to offer

- 3 -

> investors as much flexibility as possible. In fact, the Equi-Vest product
> is a leader in this feature, as the industry standard for maximum transfers
> between sub-accounts is currently twelve. Moreover, we have no
> restrictions on the timing of the transfers. A client, for example, can
> request ten transfers a week in [sic] he so desires. (FAC, Exh. D.)

He then indicated that he would "guarantee a special arrangement" to address

Emerald's concerns regarding unlimited transfers:

> We are willing to ensure that if the *Maximum Transfer Flexibility Option*
> is limited some time in the future, your client only, will be guaranteed at
> least twenty-six transfers per contract year. We believe this amount
> alone, or in combination with the free corridor and asset rebalancing
> feature, will meet your client's needs. (Id.)

Emerald informed Equitable that it would eventually like to establish five

separate annuity accounts, each with an initial funding of $12 million. (FAC ¶ 22.)

Equitable promised Emerald that it would permit such investments and would extend

the terms of the 26-transfer minimum "Special Transfer Agreement" to all such

accounts. In a letter dated April 29, 1999, Hug wrote to Ruplin:

> As a supplement to my letter dated April 15, 1999, I want to confirm the
> special transfer agreement we granted for the first Emerald Trust Equi-
> Vest annuity, and extend it to any additional Equi-Vest annuities
> purchased by the Emerald Trust. For all Equi-Vest annuities of the
> Emerald Trust, we guarantee that if we impose a transfer limit, we will
> still allow 26 transfers from the date of the announced limit through the
> end of the calendar year. (FAC, Exh. E.)

In reliance on Equitable's promises, Emerald opened two $12 million Equi-Vest

annuity accounts: one on April 28, 1999, and one on May 9, 1999. The accounts were

opened not in Emerald's name, but in the name of Plaintiff American National Bank

and Trust Company of Chicago ("American National Bank" or "ANB"). While

American National Bank is the legal owner of the annuities, it holds title for the benefit

- 4 -

of Emerald and does not control, manage, or supervise investment decisions. (FAC ¶ 3.)

For each Equi-Vest account, Equitable issued a "Certificate" which set forth the standard terms and conditions governing the account. (See generally FAC, Exhs. F and G.) The Certificates were issued in the name of American National Bank "as trustee." The Certificates provide that the "number of free transfers in a Contract Year" shall be "Unlimited." They further provide that all transfers will be made on the business day on which Equitable receives a transfer request in a form acceptable to it. Although the Certificates are silent as to the types of transfer requests Equitable considered acceptable, a pamphlet enclosed with the Certificates described several options, including a 24-hour a day, 7 day per week telephone request system. Equitable also suggested to Emerald that it send its transaction requests by fax. (FAC ¶ 31.)

In addition, each Certificate contains a boilerplate integration clause stating, "The Contract is the entire contract between the parties. It will govern with respect to our rights and obligations." The "Contract," which Plaintiffs never saw or obtained, is defined in the Certificates as "the Group Annuity Contract named in the Data pages" of the Certificate, i.e. Group Annuity Contract No. AC 6725. Neither Certificate includes the terms of the Special Transfer Agreement.

After Emerald opened the two Equi-Vest annuity accounts, Equitable attempted to divert Emerald's future investments away from the Equi-Vest product and into other investments. (FAC ¶ 33-34.) Emerald reminded Hug and Ruplin of the parties' agreement that Emerald could fund five annuity accounts of $12 million each, all to be subject to the Special Transfer Agreement. (FAC ¶ 35.) In response, Hug and Ruplin

recommended a number of mutual funds in which Emerald could invest and ensured Emerald that the Special Transfer Agreement would apply to any such investments. (FAC ¶ 35-37.) In particular, Equitable promised to apply the Special Transfer Agreement to an annuity product called the Equitable Accumulator. (FAC ¶ 37.)

In reliance on these assurances Emerald, through its trustee American National Bank, opened a $12 million Equitable Accumulator account on September 29, 1999. On that date, Rubin sent Hug the following letter:

> Please be advised that it is our intention to comply with your request that we maintain our investments in the separate accounts of the annuities controlled by Emerald Investments at a level not to exceed 1% of the total assets of each separate account per annuity. In addition, as you requested, we also intend to execute transfers between the separate accounts and the guaranteed account to average approximately 26 times per year. (See FAC, ¶ 42 and Exh. J.)

According to the First Amended Complaint, this letter confirmed the parties' understanding that the Special Transfer Agreement would apply to the newly opened Accumulator annuity.

Equitable issued a Certificate for the Accumulator annuity in the name of American National Bank "FBO Emerald Investments." (See generally FAC, Exh. H.) Like the Certificates issued for the Equi-Vest annuities, the Accumulator certificate provides that transfers will be made on the business day on which an acceptable request was received by Equitable. It also contains an identical integration clause. With respect to transfer rules, the Accumulator Certificate states only that "Transfers among Investment Options...may be made at any time during the Contract Year." The Accumulator Certificate does not include the terms of the Special Transfer Agreement.

Equitable engaged in trading among the various investments in its accounts, and its investments grew accordingly. On or about July 20, 2000, Equitable's parent company, Defendant AXA Financial, Inc. ("AXA Financial"), through its subsidiary AXA Client Solutions, LLC ("AXA Client Solutions"),[1] informed Emerald that its trading practices violated "company policies" against "market timing." (FAC ¶ 45.) This was the first time that anyone from Equitable, AXA Financial, or AXA Client Solutions had informed Emerald that its trading strategy was undesirable or violated company policy, or indeed that any such policy existed. (Id.) On July 27, 2000, AXA Client Solutions Executive Vice President Brian O'Neil wrote to Emerald's Rob Rubin to notify Emerald "to stop market timing, specifically to stop making transfers between funds for less than a week, as of Monday, July 31, 2000." (FAC, Exh. K.) O'Neil stated that AXA Client Solutions was unable to compromise on this point because of the impact Emerald's trading practices were having on AXA's other clients. He further indicated that if Emerald did not stop market timing AXA would no longer accept telephone, fax, or electronic fund transfer requests from Emerald but rather would require it to send its requests by U.S. Mail.

Emerald continued trading as it had been before O'Neil's letter. Between September 7 and 11, for example, Emerald transferred roughly $55.5 million into and back out of several of its Equitable funds. (FAC, Exh. L.) In O'Neil's opinion these transfers violated the market timing policy because "the transfer out of the international

---

[1] According to the First Amended Complaint, the AXA Defendants exercises significant formal and actual control over Equitable's operations, including the marketing of Equitable's products and the control and supervision of its business relationships.

equity funds occurred in less than 5 business days from the transfer into these funds."
AXA Client Solutions therefore informed Emerald that it planned to implement the
threatened policy of requiring Emerald to submit transfer requests by mail only. On
September 19, 2000, Emerald attempted to submit a transfer request by facsimile, as
had henceforth been the accepted practice between the parties; Equitable refused to
execute the transaction. On September 21, Emerald offered to hand deliver future
requests to Equitable's offices by messenger, but AXA Client Solutions refused to
permit such procedures.

On October 13, 2000, Emerald wrote to AXA Client Solutions and demanded
that it either abide by the Special Transfer Agreement or refund Emerald's investments
in the annuities. On October 16, 2000, AXA responded that it intended to maintain its
mail-only policy but would "process [Emerald's] request for funds." The next day,
Brian O'Neil left a voice mail message for Rob Rubin indicating that Defendants
would charge a contractual "surrender" fee of $2.16 million in connection with the
withdrawal of funds from the annuities.

Emerald contends that Defendants' refusal to permit it to transfer money freely
among its accounts within a short period of time has prevented Emerald from executing
trades "with the speed and flexibility it had bargained for." Thus on October 30, 2000,
Emerald and American National Bank (as trustee for Emerald) filed a three-count
complaint against Equitable, AXA Client Solutions, and AXA Financial, alleging
breach of the Special Transfer Agreement and conversion. As relief, Plaintiffs sought
compensatory and punitive damages, attorneys' fees, and an injunction preventing

Defendants from restricting Emerald's trading activity under the "1999 Trading Agreement."

Defendants moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint. The motion was granted in part and denied in part. See February 14, 2001, Mem. Op. (hereinafter, "February 14 Opinion"). In particular, the Court dismissed without prejudice all of Plaintiffs' breach of contract claims, with the exception of Emerald's claim against Equitable for breach of the Special Transfer Agreement as applied to the two Equi-Vest annuity accounts. Plaintiffs' claims for conversion and attorneys fees were also dismissed. Plaintiffs then filed a seven-count First Amended Complaint, which Defendants have now moved to dismiss, in its entirety, for failure to state a claim on which relief may be granted. See Fed. R. Civ. P. Rule 12(b)(6).

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Bontkowski v. First National Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993). Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. Id. In ruling on a motion to dismiss, we must accept all well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff. Turner/Ozanne v. Hyman/Power, 111 F.3d 1312, 1319 (7th Cir. 1999). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S.

41, 45-46 (1957); see also Hartford Fire Insurance Co. v. California, 509 U.S. 764 (1993); Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir. 1994). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992).

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed. R. Civ. P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993). It is with these principles in mind that we turn to the motion before us.

## DISCUSSION

### I. Count I - Breach of the Special Transfer Agreement

### A. Existence of valid and binding contract

Count I alleges that the Special Transfer Agreement described in the April 15 and April 28, 1999, letters from Hug to Ruplin was a legally binding contract, and that "by their actions and statements," Defendants breached the agreement. This count was included in Plaintiffs' first complaint, and we dismissed it in part. We first held that Plaintiffs had adequately alleged that the Special Transfer Agreement was a valid and binding contract with respect to both of Emerald's Equi-Vest annuities. See Mem. Op.

at 12. This ruling stands, as the allegations of the complaint have not materially changed on this point.

With respect to Emerald's Accumulator annuity, the February 14 Opinion dismissed Plaintiffs' claim for breach of the Special Transfer Agreement (the "STA" or "Agreement") because, on its face, the Agreement applied only to Equi-Vest annuities. See Mem. Op. at 12. Plaintiffs have now cured this deficiency by alleging, as discussed in detail above, that Equitable orally extended the Special Transfer Agreement to the Accumulator account and that without such an extension Emerald would not have invested in the Accumulator. (FAC ¶ 37-42.) Plaintiffs have also attached to the First Amended Complaint a copy of a letter which could be read to confirm this agreement. (FAC, Exh. J.) These allegations are sufficient to raise an inference that the Special Transfer Agreement applied to both Emerald's Equi-Vest and Accumulator annuities. Our prior holding to the contrary no longer applies.

Finally, Defendants argue that pursuant to the boilerplate merger clause contained in § 9.01 of the Certificates, the transfer rules listed in the Certificates supersede the alleged Special Transfer Agreement with respect to the two annuities purchased after the parties entered into the Agreement – the second Equi-Vest and Accumulator accounts. The merger doctrine provides that a subsequent complete, valid written agreement will supersede all prior agreements on the same subject matter. See Barille v. Sears Roebuck & Co., 289 Ill. App. 3d 171, 177, 682 N.E.2d 118, 123 (1st Dist. 1997); Primex Int'l Corp. v. Wal-Mart Stores, 89 N.Y.2d 594, 599-600, 679

N.E.2d 624 (1997). Both Illinois and New York courts[2], however, recognize an exception to the merger rule "where the parties manifest an intent to have the [original] contract's provisions survive." <u>Policastro v. Town of La Grange</u>, 597 N.Y.S.2d 794, 795, 193 A.D. 950 (3d Dept. 1993); <u>see also</u> <u>Alton Banking & Trust Co. v. Schweitzer</u>, 460 N.E.2d 105, 108, 121 Ill. App. 3d 629 (5th Dist. 1984) (finding exception to merger rule where "it plainly appears, from the character of the contracts, that the last one was not intended to be in performance or supersedure of the former one, and that the provisions in the former, not embraced in the latter, were intended to remain unaffected") (quoting <u>Ely v. Ely</u>, 80 Ill. 532, 537 (1875)). The Court can infer from the language of the original letters memorializing the Special Transfer Agreement and the September 29, 1999, letter confirming its application to the Accumulator annuity that the parties intended the Special Transfer Agreement, a special deal offered by Equitable to secure Emerald's business, to survive the later issuance by Equitable of standard form Certificates setting forth the general terms and conditions governing its annuity products. The merger doctrine is thus presently inapplicable and does not operate to bar Plaintiffs' recovery under the Special Transfer Agreement.

## B. Satisfaction of condition precedent

Defendants next argue that the Special Transfer Agreement's guarantee of 26 unrestricted transfers per year was expressly conditioned on a future limitation of the Maximum Transfer Flexibility Option ("MTFO"). According to the May 1, 1998,

---

[2] There is apparently a dispute, not presently before the Court, over which state's law govern's the contract. The parties have cited to both Illinois and New York law in their briefs. As the two do not differ materially for purposes of Defendants' motion to dismiss, we need not resolve the conflict at this time.

Equi-Vest Prospectus, investors in the product could choose one of two methods for selecting where to invest their contributions to the annuity – the Maximum Fund Choice option, which involves restrictions on the amounts transferred, or the Maximum Transfer Flexibility Option, which involves restrictions on the types of funds in which money can be invested but no limitation on the amount of funds that may be transferred. While the First Amended Complaint does allege that Defendants imposed restrictions on Emerald's ability to trade freely among its various investments, it does not expressly allege that Defendants modified the rules governing trading under the MTFO. Defendants contend that only this type of modification would satisfy the condition precedent and trigger its duty to permit Emerald 26 unrestricted transfers per year in its Equi-Vest accounts.

This argument fails, as Defendants cannot establish that the limitation of the MTFO was a condition precedent to operation of the Special Transfer Agreement. The Agreement was allegedly memorialized in two key letters authored by Mark Hug, Senior Vice President of Equitable. Defendants point to Hug's April 15, 1999 letter to sales agent Ferdinand Ruplin, which states that "if the *Maximum Transfer Flexibility Option* is limited some time in the future, your client only, will be guaranteed at least twenty-six transfers per contract year." This language must, however, be read in conjunction with Hug's April 29 letter, which confirms more generally that "if we impose a transfer limit, we will still allow 26 transfers from the date of the announced limit through the end of the calendar year." The Special Transfer Agreement, therefore, is at best ambiguous as to whether a change specifically to the *Maximum Transfer Flexibility Option* was a condition precedent to operation of the Agreement.

Neither New York nor Illinois law favors conditions precedent. Kass v. Kass, 663 N.Y.S.2d 581, 235 A.D.2d 150 (2nd Dep. 1997) (if language is in any way ambiguous, law does not favor construction which creates condition precedent); Premier Elec. Const. Co. v. American Nat. Bank of Chicago, 658 N.E.2d 877, 276 Ill. App. 3d 816 (1st Dist. 1995) (same). Thus when a contract is ambiguous and "a party to [the] contract contends that language it inserted into the agreement creates a condition precedent, that party must establish that the parties intended such a condition at the time they entered the contract." Meyer v. Marilyn Miglin, Inc., 652 N.E.2d 1233, 273 Ill. App. 3d 882 (1st Dist. 1995); see also Lui v. Park Ridge at Terryville Ass'n, Inc., 601 N.Y.S.2d 496, 196 A.D.2d 579 (2nd Dep. 1993) (intent to create condition precedent must appear on face of contract). The allegations of the complaint, when viewed in the light most favorable to Plaintiffs, establish the opposite – that the parties intended for the twenty-six transfer guarantee to apply to the annuity accounts in the event of *any* future restrictions on Emerald's ability to transfer, regardless of whether such restrictions arose out of a limitation on the MTFO or otherwise. In other words, we can at least infer from the complaint that the parties did not intend for Defendants to create an end run around the Special Transfer Agreement by leaving the MTFO intact, while imposing other significant restrictions on Plaintiffs' ability to transfer freely among the investments in its Equi-Vest accounts.

Because limitation of the MTFO was not a condition precedent to the operation of the Special Transfer Agreement, we find no significance in the fact that the MTFO was not offered in conjunction with the Accumulator product. As discussed above, the First Amended Complaint specifically alleges that the Special Transfer Agreement was

- 14 -

extended to the Accumulator; the writing confirming such extension makes no mention of a prerequisite of limitation of the MTFO. For this reason and those articulated above, we reject Defendants' argument that Count I must be dismissed for failure to allege satisfaction of a condition precedent to operation of the Agreement.

## C. Parties to the Special Transfer Agreement

The February 14 Opinion dismissed the claim for breach of the Special Transfer Agreement as against Defendants AXA Client Solutions and AXA Financial, who were not alleged to be parties to the Agreement. The First Amended Complaint does not differ materially from the original complaint in this respect, and Plaintiffs have indicated their intent to abide by the holding of the February 14 Opinion. We therefore dismiss Count I as to both AXA Defendants.

The February 14 Opinion also dismissed the claim for breach of the Special Transfer Agreement as to Plaintiff American National Bank which, like the AXA Defendants, was not alleged to be a party to the Agreement and therefore lacked standing to enforce it. Defendants ask us to once again dismiss Count I as to ANB on this basis. Plaintiffs contend that the allegations of the First Amended Complaint leave open the possibility that Emerald was acting as ANB's agent when it entered into the Special Transfer Agreement. Plaintiffs also argue that ANB has standing as a third party beneficiary to enforce the Agreement.

For a third person to sue on a contract to which it was not a party, "the promisor's intention must be evidenced by an express provision in the contract identifying the third-party beneficiary." A.J. Maggio Co. v. Willis, 738 N.E.2d 592, 599, 316 Ill. App. 3d 1043 (1st Dist. 2000); see also Conklin v. City of Saratoga

Springs, 699 N.Y.S.2d 820, 267 A.D.2d 841 (3d Dept. 1999) (intent to benefit third party must be evident on face of contract). The allegations in the First Amended Complaint establish that both parties to the Special Transfer Agreement – Emerald and Equitable – intended for the agreement to apply to specified Equitable accounts to be opened not by Emerald but by the trust created in its name. The two April 1999 letters memorializing the Agreement expressly state that the Agreement is in reference to annuities owned or to be purchased by the "Emerald Trust." Rob Rubin's September 29, 1999, letter confirming the extension of the Agreement to the Accumulator annuity similarly references the annuity purchased by ANB on behalf of the trust; the letter appears to have been signed under a power of attorney from ANB. These allegations are sufficient, at this early stage of the proceedings, to raise an inference that the Special Transfer Agreement was entered into by Emerald for the benefit of the trust established in its name. They also raise a potential question of fact as to whether, in entering into the Special Transfer Agreement, Emerald acted on its own behalf or on behalf of the trust. See McCracken & McCracken v. Haegele, 618 N.E.2d 577, 582, 248 Ill. App. 3d 553 (1st Dist. 1993) (intent of agent signatory to agreement to bind principal is question of law); Rosenkranz v. Schreiber Brewing Co., 39 N.E.2d 257, 287 N.Y. 322 (1942) (authority of agent is question of law). In either scenario ANB, as trustee, would have standing to assert the rights of the trust. The motion to dismiss Count I as to Plaintiff ANB is therefore denied.

In sum, the motion to dismiss Count I is denied with respect to Plaintiffs' claim against Equitable for breach of the Special Transfer Agreement. The motion is granted

as against Defendants AXA Client Solutions and AXA Financial, who are not alleged to have been parties to the Agreement.

## II. Count II – Breach of the annuity Certificates

### A. Parties to the Certificates

In Count II, Plaintiffs allege that the restrictions Defendants imposed on Emerald's trading activity violated the specific terms of the Certificates governing its annuity accounts as well as the duty of good faith and fair dealing inherent in those contracts. This count is dismissed as against the AXA Defendants, which are not alleged to have been parties to the contracts at issue. Defendants argue that the claim should also be dismissed with respect to Emerald, since the Certificates were issued only in the name of ANB.

As mentioned above, a third person may sue to enforce a contract to which it was not a party if the contract was entered into for the direct benefit of the third person. See A.J. Maggio Co. v. Willis, 738 N.E.2d 592, 599, 316 Ill. App. 3d 1043 (1st Dist. 2000); Conklin v. City of Saratoga Springs, 699 N.Y.S.2d 820, 267 A.D.2d 841 (3d Dept. 1999). It is clear on the face of the Certificates that ANB purchased and held the annuities on behalf of Emerald. (See "Certificates," FAC, Exhs. F, G, and H, p. 1 (listing "Owner" of annuities as "Amer Natl Bank & Trust As Trustee" or "American Natl Bank Trust FBO Emerald Investments").) Emerald may therefore have standing as a third-party beneficiary to enforce the contract. Id. See also In re Estate of Rubloff, 645 N.E.2d 370, 260 Ill. App. 3d 1070 (1st Dist. 1994) (It is within the Court's discretion to permit the beneficiary of a trust to be a party to a suit affecting the trust

res.) The motion to dismiss Count II as to Emerald for lack of standing is therefore denied.

## B. Interpretation of the Certificates

Defendants next challenge Count II as a whole, arguing that Plaintiffs cannot demonstrate a breach of the Certificates. The interpretation of an unambiguous, integrated contract involves conclusions of law. <u>Bourke v. Dun & Bradstreet Corp.</u>, 159 F.3d 1032, 1035 (7th Cir. 1998). Whether a contract is clear and unambiguous is similarly a question of law for the court. <u>American Nat. Trust Co. of Chicago v. Kentucky Fried Chicken of Southern California, Inc.</u>, 719 N.E.2d 201, 308 Ill. App. 3d 106 (1st Dist. 1999); <u>Schreiber v. Cimato</u>, 722 N.Y.S.2d 680 (4th Dept. 2001). The determination of whether Defendants' conduct, as alleged in the complaint, may constitute a breach of the Certificates is therefore appropriate for adjudication on a motion to dismiss. <u>Forest Glen Community Homeowners Ass'n v. Bishof</u>, 746 N.E.2d 1285 (Ill. App. 2d Dist. 2001); <u>Fernandez v. Fernandez</u>, 718 N.Y.S.2d 509, 278 A.D.2d 882 (4th Dept. 2000).

Plaintiffs' first allegation of breach centers around Equitable's alleged refusal to make transfers on the "Transaction Date," as specified and defined in the Certificates. Section 1.23 of the Certificates defines "Transaction Date" as "the Business Day we receive at the Processing Office a Contribution or transaction request providing the information we need." Section 4.01 provides that "All transfers will be made on the Transaction Date." According to Plaintiffs, Equitable failed to abide by these provisions.

Plaintiffs next allege that Equitable's unilateral imposition of the 4-5 day hold and "mail-only" transfer request rules violated a variety of provisions in the Certificates. Section 4.02 of all three Certificates states that "[t]he transfer rules which apply are described in the Data pages." The Data pages of the Equi-Vest Certificates reference Section 4.02 and list a number of restrictions on the monetary amounts of transfers. They also specify that the "Number of free transfers in a Contract Year" is to be "Unlimited," with the exception that certain types of transfers will incur a $25 charge. The data pages of the Certificate for the Accumulator annuity also references Section 4.02. It provides that "Transfers among Investment Options...may be made at any time during the transfer year." Finally, although the Certificates are silent as to the types of transfer requests Equitable would accept, a pamphlet enclosed with the Certificates described several options, including the 24-hour a day, 7 day per week TOPS telephone request system. Equitable had also suggested to Emerald that it send its transaction requests by fax, and had initially accepted requests submitted in this format. (FAC ¶ 31.)

Defendants do not dispute for purposes of their motion to dismiss that Equitable's conduct, as alleged, was contrary to the above referenced terms of the Certificates. Rather, they claim that its actions were authorized by Section 4.02 of the Certificates, which provides, "We have the right to change our transfer rules. Any change will be made upon advance notice to you." Plaintiffs contend that Section 9.01 of the Certificates imposes a limitation on Equitable's ability to make changes under Section 4.01. Section 9.01 provides, in pertinent part:

> In addition to the rights of change reserved by us as provided in this Certificate, the Contract may be changed by amendment or replacement upon agreement between the Contract Holder and us...provided that no rights, privileges or benefits under the Contract and this Certificate with respect to Contributions made hereunder prior to the effective date of such change may be adversely affected by an amendment without the consent of the Contract Holder and each Certificate Holder.

Plaintiffs claim that contributions they made to the annuities prior to imposition of the mail-only and 4-5 day hold transfer restrictions were adversely affected by those restrictions, and that therefore the transfer rule changes could not be made without their prior consent.

The Court cannot conclusively determine from the language of the Certificates that Equitable had the unrestricted right to change its transfer rules as it is alleged to have done. Viewing the facts in the light most favorable to Plaintiffs, as we are required to do on Defendants' Rule 12(b)(6) motion to dismiss, we cannot rule out the possibility that Defendants were required by the language of Section 9.02 to obtain ANB's consent before modifying key terms of the annuity contracts. We therefore find that Count II states a claim for breach of the express terms of the Certificates.

In addition, Plaintiffs adequately allege that Defendants' particular unilateral modifications to the transfer rules constituted a breach of the implied covenant of good faith and fair dealing inherent in all contracts. Good faith requires a party vested with contractual discretion to exercise it "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Perez v. Citicorp Mortgage, Inc., 301 Ill. App. 3d 413, 424, 703 N.E.2d 518 (1998). See also Nyack Nursing Home v. Dowling, 656 N.Y.S.2d 440, 230 A.D.2d 42 (3d Dept. 1997) (covenant of good faith and fair dealing "embraces a pledge that

neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (citations and quotation marks omitted). While Equitable had the contractual right to change its transfer rules under the Certificates, it also had the duty to do so in a manner consistent with the expectations of the parties. Plaintiffs have sufficiently alleged that the new transfer rules Equitable imposed were so unduly restrictive as to constitute a breach of this duty. Count II therefore states a claim against Equitable for breach of the covenant of good faith and fair dealing implied in the Certificates.

## III. Count III – Breach of the Certificates as amended by the Special Transfer Agreement

Count III alleges that the Special Transfer Agreement was not an independent contract but rather modified the relevant prospectuses and amended and was incorporated into the Certificates. It further alleges that Defendants breached the Special Transfer Agreement, as incorporated into and amending the Certificates, by restricting Emerald's trading activity. Defendants' challenges to this count are each addressed in detail, and rejected, in our discussion in Part I, above. The merger clauses in the second Equi-Vest and Accumulator Certificates do not supersede and render unenforceable the Special Transfer Agreement. Nor is Emerald, a non-party to the Certificates, necessarily precluded from modifying them by entering into the Special Transfer Agreement. As discussed above, in negotiating the Special Transfer Agreement Emerald may have been acting as an agent of the trust. As such, it may have been vested with the authority to modify the Certificates on ANB's behalf.

Nonetheless, we do note that neither AXA Client Solutions nor AXA Financial is alleged to have been a party to either the Certificates or the STA. Count III is therefore dismissed as to those Defendants. The motion to dismiss the claim is denied with respect to all other parties.

## IV. Count IV – Breach of contract with respect to future annuity purchases

According to the First Amended Complaint, Emerald informed Equitable prior to investing in any annuities that it sought to invest a total of $60 million dollars in five separate accounts with an initial funding of $12 million each. (See FAC at ¶ 22.) Equitable allegedly agreed to this arrangement, and promised to apply the Special Transfer Agreement to all five annuities. (See FAC at ¶ 23, 67.) In Count IV, Plaintiffs allege that by imposing transfer restrictions which breached the Certificates for the three existing annuity accounts, as amended by and incorporating the Special Transfer Agreement, Defendants communicated their intent to apply the same restrictions to any accounts Emerald (through ANB) opened in the future. Plaintiffs claim that in doing so, Defendants committed an anticipatory breach of Equitable's agreement to permit Emerald to open two additional $12 million accounts with the unrestricted-transfer terms it had negotiated.

Defendants argue that the agreement alleged in the First Amended Complaint is not a contract but a mere agreement to agree, as many of the material terms and conditions were left for future negotiations. Plaintiffs have alleged that Emerald and Equitable agreed that: (1) Emerald would be entitled to purchase five separate annuity accounts with initial balances of $12 million; (2) each account, if funded, would be subject to the specific transfer rules set forth in the Certificates and Special Transfer

Agreement; (3) Emerald invested $36 million into three Equitable annuities in reliance on Equitable's promise that it would be entitled to open two additional $12 million accounts in the future. The decisions the parties reserved for the future – who the annuitants and beneficiaries of the accounts would be, the dates on which the accounts would be opened and mature, the precise type of Equitable annuity they would be – were not so fundamental as to render the agreement unenforceable. "[A] contract is sufficiently definite and certain if the court is enabled, from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain certain what the parties agreed to." Bielecki v. Painting Plus, 637 N.E.2d 1054, 1061, 264 Ill. App. 3d 344 (1st Dist. 1994) (citing Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill. 2d 306, 515 N.E.2d 61 (1987)); see also Sud v. Sud, 621 N.Y.S.2d 37, 38, 211 A.D.2d 423 (1st Dept. 1995) (essential terms of contract must be pled). Here, the Court can easily discern from the First Amended Complaint the essential terms of the alleged agreement between the parties: in exchange for Emerald's investing in Equitable's products, Equitable guaranteed Emerald the right to open a minimum of five $12 million Equitable annuity accounts with a guaranteed minimum of twenty-six unrestricted transfers per year. This contract, if proven, would be more than a mere agreement to agree.

The motion to dismiss Count IV of the First Amended Complaint is therefore denied as to Defendant Equitable. The AXA Defendants are not alleged to have been parties to the relevant agreement, and therefore Count IV is dismissed as to them.

## V. Count V – Promissory estoppel against Defendant Equitable

Count V, which is pled in the alternative, alleges that Emerald relied to its detriment on Equitable's promise that the Special Transfer Agreement would apply to the Accumulator and was injured when Equitable failed to abide by that promise. According to the complaint, Equitable induced Emerald to forego further Equi-Vest accounts and invest instead in the Accumulator annuity by calculating and advising Emerald of the maximum amount of money that Emerald could trade in the funds that operate in such account. (See FAC ¶ 72.) Equitable also assured Emerald that the Special Transfer Agreement described above would apply equally to Emerald's Equi-Vest and Accumulator accounts. (See id.) In reliance on this promise, Emerald agreed to open the Accumulator account with an initial capital investment of $12 million. (See FAC ¶ 73-74.) Equitable subsequently refused to apply the Special Transfer Agreement to the Accumulator and refused to permit Emerald to transfer its investments in the Accumulator as freely as it could in the Equi-Vest accounts. (See FAC ¶ 75.) When Emerald sought to withdraw its money from the Accumulator as a result of the transfer restrictions, Equitable imposed a substantial "surrender" fee on the account. (See FAC ¶ 76.)

Defendants move to dismiss this claim, citing the irrefutable rule that the doctrine of promissory estoppel is inapplicable where the existence of a contract between the parties is not disputed. See, e.g., Jackson v. Encyclopedia Britannica Educ. Corp., 1996 WL 604013, at *6 (N.D. Ill. Oct. 16, 1996) (applying Illinois law); Wesley, Brown & Bartle Co. v. Pizza Hut of Amer., 1998 WL 193253, at *2 (S.D.N.Y. Apr. 21, 1998) (applying New York law). Because the parties do not dispute the

existence of the Accumulator contract – presumably the Certificate and Group Annuity Contracts included therein – Defendants argue that promissory estoppel cannot apply. The relevant disputed contract, however, is not the Accumulator Certificate but the agreement to apply the Special Transfer Agreement to the Accumulator annuity. As Defendants' arguments in support of their motion to dismiss Count I make clear, Defendants do not concede that such alleged agreement was a valid and binding contract. Furthermore, Defendants dispute that Emerald was either a party to or third party beneficiary of the Accumulator contract. Accordingly, Count V cannot be dismissed on the ground that the promise upon which is it based forms part of a contract between the relevant parties.

Defendants next reargue the point that the Accumulator agreement was fully integrated. The motion to dismiss on this ground is denied for the reasons set forth in Part I, above.

Finally, Defendants contend that Plaintiffs cannot show the detrimental reliance necessary to support a claim for promissory estoppel. Under New York law, a plaintiff asserting promissory estoppel must demonstrate that "the circumstances are such as to render it unconscionable to deny the promise upon which the promisee has relied." Abrams v. Unity Mut. Life Ins. Co., 70 F. Supp.2d 846, 853 (N.D. Ill. 1999) (quoting Paper Corp. v. Schoeller Technical Papers, Inc., 724 F. Supp. 110, 118 (S.D.N.Y.1989)). Under Illinois law, a plaintiff must show that "grave injustice" would result if the promise were not enforced. Hux v. Woodcock, 474 N.E.2d 958, 961, 130 Ill. App. 3d 721 (5th Dist. 1985). Plaintiffs contend that these requirements are satisfied by the allegations of the First Amended Complaint. We agree.

According to the complaint, Plaintiffs invested $12 million in Equitable's Accumulator product based on Equitable's promise to assure them a minimum of 26 transfers among the investment options in that annuity. When it made this promise, Equitable was allegedly aware of Emerald's desire to maintain trading flexibility and the likelihood that without the stated guarantee Emerald would not have opened an Accumulator account. When Emerald/ANB wrote Equitable to confirm the arrangement, Equitable did not inform Emerald that it withdrew its promise, but instead proceeded to process Emerald's purchase of an Equitable product with a multimillion dollar value. Emerald's investment of $12 million in a product that did not satisfy its requirements, withdrawal from which carried a potential surrender fee of several hundred thousand dollars, is sufficiently "detrimental" to support Emerald's claim for promissory estoppel.

As with the other Counts in the complaint, the AXA Defendants are not specifically alleged to have made any promises to Emerald or ANB. The motion to dismiss Count V is therefore granted as to them and denied as to all other parties.

## VI. Conversion

Count VI alleges that by charging a "surrender" fee of $2.16 million dollars on Emerald's withdrawal of its funds from the three annuity accounts, Equitable wrongfully converted Emerald's investment proceeds. Section 8.01 of the Certificates authorizes Equitable to levy a charge on the early withdrawal of contributions from the annuity accounts. In Defendants' first motion to dismiss, they argued for dismissal of Plaintiffs' conversion claim on the ground that § 8.01 authorized the very fee charge of which Plaintiffs complained. Plaintiffs countered that a party that breaches one

provision of a contract cannot seek to enforce other provisions to its benefit. The Court rejected this argument, as Plaintiffs had failed to allege any breach of the Certificates either alone or in combination with the Special Transfer Agreement. The First Amended Complaint cures this problem. Nevertheless, Count VI suffers from another fatal defect.

The economic loss doctrine prevents a plaintiff from recovering in tort purely monetary losses resulting from the defeated expectations of a commercial bargain, regardless of the plaintiff's ability to recover such losses in contract. Anderson Electric, Inc. v. Ledbetter Erection Corp., 115 Ill.2d 146, 153, 503 N.E.2d 246 (1986) (citing Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 435 N.E.2d 443 (1982); Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 1992 WL 121726, at *23 (N.D.N.Y. May 23, 1992) (applying New York law). Application of the doctrine is particularly prudent where, as here, the success or failure of the claim turns on an interpretation of the contract(s) between the parties. Accordingly, we find that Plaintiffs' conversion claim is barred by the economic loss doctrine and dismiss it on that basis.

## VII. Count VII – Injunctive relief

In the final count of the First Amended Complaint, Plaintiffs seek an injunction restraining Defendants from enforcing their "market timing" restrictions against Emerald and ordering Equitable to return the $2.16 million it withheld as a purported withdrawal charge. This claim withstood the first motion to dismiss, and the allegations of the First Amended Complaint are identical to those of the original complaint. Nonetheless, Defendants have challenged the claim anew, asserting a

combination of the standing and contract validity arguments they raised with respect to Plaintiffs' other claims. Each of these issues has been resolved in favor of Plaintiffs, with one exception: the AXA Defendants are not alleged to be parties to any contract alleged in the First Amended Complaint. Because we agree with Defendants that Plaintiffs' injunction claim is a claim for specific performance of the contract alleged in Count III, we must dismiss the claim against nonparty Defendants AXA Financial AXA Client Solutions. The remainder of Count VII stands, for the reasons set forth in Parts I through IV, above, and Part IV of the February 14 Opinion.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part, as follows: (1) all claims against AXA Client Solutions and AXA Financial are dismissed without prejudice; (2) Count VI is dismissed, with prejudice, in its entirety; and (3) the motion to dismiss is denied with respect to all remaining parties and claims.


Charles P. Kocoras
United States District Judge


Dated:   June 28, 2001