Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6786 | **DATE** | 3/4/2004 |
| **CASE TITLE** | American National Bnk and Trust vs. AXA Client Solutions (00 C 6786)<br>The Equitable Life Assurance Society of US v. American Natl Bnk & Trust (01 C 9974) | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Emerald's motion for summary judgment is granted in its entirety in 01 C 9974. All other pending motions in 01 C 9974 are hereby moot. All matters in controversy having been resolved in 01 C 9974, and there being no just reason for delay, final judgment is entered in favor the Defendants/Counter-Plaintiffs and against Plaintiff/Counter-Defendant in 01 C 9974.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAR 0 5 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 427 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| ✓ | Copy to Magistrate Judge Ashman. | CLERK | | |
| | SCT | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN NATIONAL BANK AND TRUST )
COMPANY OF CHICAGO as Trustee f/b/o )
EMERALD INVESTMENTS LP, and EMERALD )
INVESTMENTS LP, an Illinois Partnership, )
)
                Plaintiffs, )
)
vs. )  00 C 6786
)
AXA CLIENT SOLUTIONS, LLC; THE )
EQUITABLE LIFE ASSURANCE SOCIETY OF )  **DOCKETED**
THE UNITED STATES; and AXA FINANCIAL, )
INC., )  MAR 0 5 2004
)
                Defendants. )
------------------------------------------------------------ )  Related Cases
THE EQUITABLE LIFE ASSURANCE )
SOCIETY OF THE UNITED STATES, )
)
            Plaintiff/Counter-Defendant, )
)
vs. )  01 C 9974
)
AMERICAN NATIONAL BANK AND TRUST )
COMPANY OF CHICAGO as Trustee f/b/o )
EMERALD INVESTMENTS LP, and EMERALD )
INVESTMENTS LP, an Illinois Partnership, )
)
         Defendants/Counter-Plaintiffs, )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on the motion of Emerald Investments, LP ("Emerald") for summary judgment in its favor of the two counts of the counterclaim. For the reasons set forth below, the motion is granted.[1]

## BACKGROUND

Emerald is a partnership that engages in trading of, among other things, variable annuities. The Equitable Life Assurance Society ("Equitable") is a New York corporation that sells investment products, including variable annuities. In early 1999, an Equitable sales agent, Ferdinand Ruplin, and a partner in Emerald, Robert Rubin, had a chance meeting. During the meeting, they discovered their common business interests and discussed some of the investment products Equitable offered. Rubin expressed interest in the unlimited transfer feature of an Equitable annuity called "Equi-Vest."

Shortly after this meeting, Equitable sent out prospectuses to Emerald describing different investment products, including one for Equi-Vest annuities. The prospectus stated that Equi-Vest included a feature called the "Maximum Transfer Flexibility" option that, if chosen, allowed an annuitant unlimited transfers of "all or portions of

---

[1] In conjunction with its response to Emerald's Local Rule 56.1 Statement of Material Facts, Equitable filed objections to three of the exhibits Emerald offered in support of its motion. Because none of these exhibits factored into our decision, we do not address the objections or Emerald's response to them.

your Annuity Account Value among the Investment Options you have chosen at any time," subject to certain restrictions that are not applicable to the facts of this case. The prospectus also provided that Equitable could "change or establish additional restrictions on transfers among the Investment Options," provided the contract holder was given 90 days' notice.

Thereafter, Emerald expressed a desire to purchase annuity contracts from Equitable. Several letters then went back and forth within Equitable and between Equitable and Emerald, regarding, in part, the unlimited transfer feature of the Maximum Transfer Flexibility option. On April 1, Rubin wrote to Ruplin to request confirmation of several aspects of Rubin's understanding of the terms the parties had discussed. The letter made repeated reference to the ability of an annuity holder an unlimited number of exchanges within any annuity and reiterated that Emerald understood this right to be irrevocable.

No one at Equitable signed the letter to confirm that they shared Rubin's understanding, but there is no dispute that Ruplin received and read it. However, two later letters from Equitable to Emerald stated that not only was there no limit on transfers under the Maximum Transfer Flexibility option, but, because of Emerald's emphasis on the importance of that feature, Equitable would guarantee 26 transfers per year for Emerald's annuities should the policy of allowing unlimited transfers ever

change. Emerald then completed a questionnaire that Equitable required for applicants who planned to invest more than $2.5 million in their annuity accounts; it indicated that Emerald found the "ability to exchange within subaccounts" to be necessary to its desire to complete the purchase of the annuity contract.

Around the end of April, Emerald purchased two "Equi-Vest" annuities. In line with the statements made in the prospectus and the correspondence between the parties, the data pages of the annuity contract state that the annuitant could execute an unlimited number of free transfers during the contract year. Shortly after the Equi-Vest annuities were funded, Emerald expressed an interest in opening up a third Equi-Vest annuity. In response, Equitable examined the trading activity in the first two annuity accounts and discovered nine transfers in the first annuity in the first month that it had funded. Equitable had also received word from an outside party that Emerald had been thrown out of other annuities. Based in part on this information, Equitable elected not to allow Emerald to obtain a third Equi-Vest account.

Approximately one month later, in July 1999, parties from both Equitable and Emerald met to discuss the parties' relationship as well as future trading possibilities. Naturally, the parties disagree over precisely what transpired at this meeting. However, in September, Equitable drafted the following language for Rubin's signature:

> [I]t is our intention to comply with your request that we maintain our investments in the separate accounts of annuities controlled by Emerald Investments at a level not to exceed 1% of the total assets of each separate account per annuity. In addition, as you requested, we also intend to execute transfers between the separate accounts and the guaranteed account to average approximately 26 times per year.

Upon reading the above, Equitable's annuity product manager, Mary Ford, wrote to Mark Hug and Naomi Weinstein, vice presidents who worked closely with the Emerald account. Ford commented that she was told the letter was supposed to have stated that Emerald would execute no more than 26 trades per year and noted the significant difference between her understanding and the above language. After further consultation with Hug, Ford concluded that the wording of the letter was appropriate. Gary Hokin signed the above letter on behalf of Emerald, and Equitable issued a third annuity contract to Emerald.

The third contract was not another Equi-Vest annuity; instead, it was a different product called the "Equitable Accumulator." This product also allowed an unlimited number of free transfers and no explicit limitation upon the amount of money that could be transferred. The Accumulator prospectus contained the following language:

> We may, at any time, restrict the use of market timers and other agents acting under a power of attorney who are acting on behalf of more than one contract owner. Any agreements to use market timing services to make transfers are subject to our rules in effect at that time.

Throughout the following year, Emerald continued to trade heavily in and out of all three annuity accounts, sometimes in very hefty amounts. Ultimately, Equitable began to restrict Emerald's trading activities. In October 2000, Emerald withdrew its funds from the three accounts and filed suit against Equitable for breach of contract and other causes of action. Equitable filed a separate complaint arising out of the described events, seeking relief for common law fraud as well as rescission of the annuity certificates. The two cases were consolidated, and discovery has been completed. Emerald now moves for summary judgment on the two counts of Equitable's later-filed complaint.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. Id. The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the

pleadings and support its contentions with proper documentary evidence. Id. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). With these principles in mind, we turn the motion before us.

## DISCUSSION

### A. Section 154 of the Illinois Insurance Code

First, we address Emerald's contention regarding 215 ILCS 5/154. This section of the Illinois Insurance Code provides, in pertinent part:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

Emerald asserts that this statute mandates summary judgment in its favor because none of the alleged misrepresentations upon which Equitable claims to have relied were

contained within the contracts or the application Emerald completed. According to Emerald's interpretation, the statute bars consideration of any other statement to support Equitable's claim of harm stemming from the alleged misrepresentations. While this is a clever argument, we agree with Equitable that the statute is simply inapplicable to the situation involved in this case. The protections embodied within this section are intended to ensure that objective evidence will be available in a case where an insurance company denies a claim for benefits when the facts of the claim would support coverage. See Inter-Insurance Exch. of Chicago Motor Club v. Milwaukee Mutual Ins. Co., 378 N.E.2d 391, 394 (Ill. App. Ct. 1978). Although the instrument in this case is arguably within the ambit of the Illinois Insurance Code, there is no contention that any of the annuitants ever sought benefits that were denied. Furthermore, as Equitable points out, the alleged misrepresentations in this case have nothing to do with the risk that Equitable insured nor the hazard that it assumed as an insurance company. Thus, Section 154 is not triggered and will not provide Emerald with an instant summary judgment.

### B. Common-Law Fraud

We next turn to consider the challenges to the first count of Equitable's complaint, which alleges that Emerald committed common-law fraud in its dealings

with Equitable. A viable claim for fraud in Illinois[2] must include a false statement of material fact, whose falsity was known or believed by the party making it. D.S.A. Fin. Corp. v. County of Cook, 801 N.E.2d 1075, 1080 (Ill. App. Ct. 2003). The party making the false statement must intend to induce the other party to act. Id. Finally, the other party must act in justifiable reliance upon the truth of the statements and be damaged as a result. Id.

Initially, we note that Equitable's opposition brief almost exclusively discusses its fraud claim as though it applied only to the inducement to enter into the annuity contracts, even though both the complaint and a small portion of the opposition allude to the effect of the claimed fraud on Equitable's decision to continue doing business with Emerald. Despite the fact that the instant motion attacks the entire complaint, Equitable develops no argument in support of the continuing vitality of this theory. Arguments not developed in a party's brief are waived; a court is not obligated to research and construct legal arguments that the parties basically ignore. Central States, Southeast, and Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 808 (7th Cir. 1999); Sanchez v. Miller, 792 F.2d 694, 703 (7th Cir. 1986).

---

[2] Equitable hints at the potential for a choice of law problem in this case, but because it does not raise the issue as more than an afterthought, we follow the general rule and apply the law of the state in which we sit, Illinois. See Wood v. Mid-Valley, Inc., 942 F.2d 425, 426 (7th Cir. 1991).

In its motion, Emerald attacks Equitable's ability to show justifiable reliance upon the representations or omissions referenced in the complaint. Normally, whether reliance is justifiable is a question of fact that is unsuited for resolution on summary judgment. Id. at 1081; Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir. 2001). However, if it is apparent that a jury could only decide one way on the question of justifiability, the question can be answered as a matter of law. D.S.A. Finance, 801 N.E.2d at 1081; Cozzi, 250 F.3d at 574.

In its complaint, Equitable identifies two representations and two omissions as forming the basis of its fraud claim: 1) Emerald's statements to the effect that it intended to execute approximately 26 transfers per annuity per year; 2) Emerald's statements to the effect that it would maintain its investments in separate accounts of the annuities at a level not to exceed 1% of the total assets of each separate account per annuity; 3) Emerald's failure to inform Equitable that it would engage in "market timing"; and 4) Emerald's failure to disclose that it would make hundreds of transfers into the accounts in each of the annuities including numerous transfers that greatly exceeded 1% of the total assets of the separate accounts. Because the third and fourth

are really nothing more than restatements of the first two, we do not consider them separately.[3]

Equitable's claim rests chiefly on its professed understanding of what Emerald's representatives stated and their subjective belief of the manner in which Emerald would exercise the rights contained within the parties' agreements. In essence, Equitable contends that their assumption that Emerald would effect relatively small trades every two weeks controls, even if the contract does not limit the number of trades or the amount thereof. The only evidence Equitable offers to support its assumption at the time the Equi-Vest annuities issued comes from a purported telephone conversation Ruplin had with one of Emerald's principals during the negotiations pertaining to the Equi-Vest annuities.[4] Ruplin stated that he was told that Emerald's normal trading pattern was to invest in a given fund for about two weeks at a time. However, the

---

[3] In its opposition brief, Equitable alludes to several other representations or omissions. The counterclaim was never amended to include these additional representations, and it is well-settled that a party cannot amend its pleading via a brief filed in connection with a motion for summary judgment. See, e.g., Speer v. Rand McNally, 123 F.3d 658, 665 (7th Cir. 1997). In any event, there would be no need to consider them in detail, as our conclusions with respect to the representations referenced in the counterclaim apply with equal force to these latecomers.

[4] Equitable attempts to shore up this assertion with the depositions and affidavits of Hug and Weinstein, vice presidents of Equitable. However, their statements are solely based on Ruplin relaying the substance of his conversation to them; this evidence is hearsay and not proper for consideration on a motion for summary judgment. Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 2000).

undisputed facts of this case unequivocally indicate that Equitable did not and could not have the understanding it now advances. From the beginning, Emerald continually stressed the importance of the possibility of making unlimited trades within the various accounts. Even the April 1 letter, despite the fact that it was never signed to indicate Equitable's agreement in its terms, makes it clear that Emerald did not attempt to hide or even downplay the feature's significance; instead, it was repeatedly highlighted. For Equitable to now contend that Ruplin's isolated conversation provides justification for it to disregard all of its other exchanges with Emerald and conclude that "unlimited" really meant "26" is simply ludicrous. See AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc., 896 F.2d 1035, 1041-41 (7th Cir. 1990).

By the time that the Accumulator annuity issued, Equitable had numerous indications that Emerald intended to engage in frequent large trades. In spite of this, the Accumulator annuity contained no restriction on the number or size of trades possible. The absence of express restrictions cannot be an oversight in these circumstances, particularly in light of the fact that Mary Ford pointed out the difference between the language of the September 29 letter and the understanding that Equitable now claims to have had of the manner in which Emerald would conduct its activities. In addition, Mark Hug stated in his deposition that the letter was drafted not by Emerald but by Equitable for Rubin's signature; if Equitable was interested in a cap on

the number of trades, the letter they drafted would not have spoken of intentions, averages, and approximations.

In any event, even if Emerald personnel had drafted the letter, it contains nothing more than expressions of future intent, which Emerald correctly notes are not ordinarily actionable under Illinois law. Mitchell v. Norman James Construction Co., 684 N.E.2d 872, 883 (Ill. App. Ct. 1997). Equitable rejoins that this doctrine does not apply to the instant case because either the statements it relied upon either involved present or historical fact or that they fell within the recognized exception to this general rule, namely that Emerald's statements were part of a scheme or device to defraud. See id.

The first contention falls flat. We have already addressed why Equitable could not have relied on any of the statements that Emerald made regarding present or historical fact. The second contention faces a like fate. The only "scheme" that Equitable claims existed was one to convince it that Emerald was a "proactive investment manager" rather than a market timer. This is nothing more than semantics. Whatever name Equitable or Emerald put on Emerald's activities, the fact remains that Equitable knew through Emerald's statements and actions during negotiation and through their own contract terms that Emerald could do precisely what it did.

Equitable's own prospectuses, the annuity contracts it drafted, and the correspondence between the parties consistently state that Emerald would be permitted

-13-

to conduct an unlimited number of transfers between its accounts in whatever dollar amounts it chose. The sole logical explanation for the presence of the statements within these documents is that Emerald indicated a need for an unlimited number of transfers in any amount, and Equitable agreed to provide them with the same. Buttressing this conclusion is Equitable's failure to invoke its contractual right to change the trading restrictions at any time relevant to its fraud claim. The undisputed facts of this case fail to show that Emerald made false statements of material fact or that Equitable was justified in relying upon an interpretation of those statements that is entirely inconsistent with their plain meaning. Consequently, Emerald is entitled to summary judgment in its favor on Count I of the counterclaim.

## C. Rescission of the Annuity Certificates

The second count of the complaint, styled as one for equitable rescission of the annuity certificates, is really nothing more than an alternative remedy for the fraud alleged in the first count (as well as a duplicative one—the prayer for relief in Count I also seeks rescission). As Emerald points out, in cases involving allegations of fraud in the formation of a contract, rescission is a potential remedy, and the elements to be considered are the same. Chapman v. Hosek, 475 N.E.2d 593, 598 (Ill. App. Ct. 1985).

Equitable contends that it was operating under a unilateral mistake of fact at the time the parties entered the three contracts, and that the mistake resulted from their

justifiable reliance upon Emerald's fraud. For the reasons set forth above with respect to the fraud claim, this contention cannot stand. If there was any mistake of fact on Equitable's part when it entered into the annuity agreements, it resulted from Equitable's unsupported assumptions about the extent of Emerald's trading activities, not misrepresentations by Emerald. See Praxair, Inc. v. Hinshaw & Culbertson, 235 F.3d 1028, 1034-35 (7th Cir. 2000). Accordingly, we grant summary judgment to Emerald on Count II.

## CONCLUSION

Based on the foregoing analysis, Emerald's motion for summary judgment is granted in its entirety.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: MAR - 4 2004